***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence REVERSES the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the deputy commissioner as:
 STIPULATIONS
1. Plaintiff experienced a specific traumatic incident on June 5, 1998. On that date, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act, defendant-employer employed three (3) or more employees and an employee-employer relationship existed between plaintiff and defendant-employer. Hartford-ITT Specialty Risk Services is the carrier on the risk.
2. Plaintiff received temporary total disability benefits for her time out of work until July 21, 1998.
3. At the hearing, the parties stipulated into evidence an indexed set of medical records concerning the plaintiff, along with IC forms, the plaintiff's discovery responses, her time records and a copy of the plaintiff's diary. Other exhibits were introduced during the course of the hearing. Thereafter, the parties stipulated into evidence one page of records of Dr. Mark Nichols.
 ***********
Based upon the competent, credible evidence from the record herein, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was hired by defendant, Laboratory Corporation effective June 1, 1998 as a service representative. In this position she was responsible for going around to medical and doctor's offices in Raleigh to pick up specimens that were to be analyzed. There were various regular routes that the service representatives would be assigned, and they were normally scheduled to work from 12:00 noon to 8:00 p.m. Defendant provided the representatives with automobiles to use to pick up the specimens. The specimens would be placed in a cooler in the trunk of the car. When the representatives finished their route, they would carry the cooler from the car into the offices of defendant, and then would be responsible for labeling and packaging the specimens to be sent to the laboratory. During the labeling and packaging part of the job at the end of the shift, a service representative would have to stand for about two hours. The other six or so hours of the shift would be spent by a service representative driving around in a car, getting in and out of the car, and walking into and out of doctor's offices. Plaintiff performed all of the above-described duties.
2. At the time plaintiff was hired, she was informed that she would be paid $7.00 an hour with the expectation that after several months she would receive an increase in pay. During the short time that plaintiff worked for defendant, she was actually required to work longer than 8 hours in order to complete her duties and responsibilities.
3. On the afternoon of June 5, 1998, plaintiff entered a building to go to a doctor's office to make a pickup. As she entered the front door into the entrance of the building she encountered water that was on the floor from rain and her legs slipped out from under her. She began to fall and twisted around abruptly to maintain her balance. She was able to grab onto the door with her left hand as she was falling backwards. She did not quite fall to the floor, as she was able to hold onto the door, but she ended up supporting most of her body weight with her left hand and arm. Amy Clement, another employee of defendant-employer who was with plaintiff, asked if she were okay and plaintiff indicated that she was shaken up.
4. Plaintiff almost immediately began experiencing a tingling sensation and pain in her back. As this pickup was near the end of the route, she was able to complete the route that day which was a Friday. Plaintiff rested over the weekend and returned to work on Monday, which is when she formally reported her injuries to her supervisor, Kathy Howard. She informed Ms. Howard that she was in considerable pain and requested to go see a doctor. Some time later that day, Ms. Howard instructed plaintiff to call for an appointment with Dr. Nichols. Plaintiff was scheduled to see Dr. Nichols on the following day, June 9, 1998.
5. Dr. Nichols took plaintiff out of work until June 17, 1998 and gave her limitations of no lifting and minimal bending. Plaintiff attempted to work on June 17 and 18, 1998, but was experiencing so much pain in her back and neck that she returned to Dr. Nichols on June 19th, and he again took her out of work.
6. Dr. Nichols sent plaintiff for physical therapy but she was in so much pain that the therapy did not prove beneficial and it was terminated after about three visits. The physical therapist who treated plaintiff was Oren LeBlang. Mr. LeBlang wrote a letter dated July 8, 1998, stating that plaintiff complained of pain with "feather like stroking". Plaintiff testified that she clearly remembered the incident and that "he was mashing very hard on my back".
7. On July 15, 1998, Dr. Nichols released plaintiff to return to work to a sedentary position lifting no more than 10 pounds. When defendant-employer was provided with Dr. Nichols' restrictions, plaintiff was assigned to driving a full route which aggravated her condition.
8. On July 16 and 17, plaintiff's job was changed and she was allowed to remain in the office doing data entry from noon until about 3:00 p.m. She was then assigned to go out on a route with another employee. As confirmed by her supervisor, Kathy Howard, even when plaintiff was performing the data entry tasks, she appeared to be in significant pain. The route she was assigned was more hectic than the one she had previously done. It required plaintiff to move more quickly and also required going up and down more stairs. At the end of each day, plaintiff would be experiencing significantly increased levels of pain.
9. On Monday, July 20, 1998, plaintiff drove from her home in Goldsboro to work in Raleigh. When she arrived she told her supervisor that she was experiencing significant pain and spasms in her back, and requested to again see Dr. Nichols. When she could not get in to see Dr. Nichols, plaintiff requested to be allowed to go to a hospital emergency room to get some medication for her pain. She was refused permission to go to the emergency room, but defendant-employer located a doctor in Durham, Dr. Christian J. Lambertsen, that plaintiff could see the same day.
10. Plaintiff traveled to Durham and first saw Dr. Henry Adonomis, who conducted almost a full exam; thereafter, Dr. Lambertson came into the room and repeated the examination. Plaintiff's pain limited her ability to comply with all of the examination requests of the doctor. Dr. Lambertson placed her on limited duty with no driving for 3 weeks.
11. By the end of this doctors' appointment, plaintiff was in so much pain, that she was barely able to walk and was unable to drive herself home to Goldsboro. She called and arranged to have a friend pick her up.
12. Over the next several days plaintiff, or someone on her behalf, called defendant-employer early each morning, informing them that plaintiff continued to be in a great deal of pain an could not work. Plaintiff was informed by her supervisor Ms. Howard, that as long as she called in and reported her status each day, there would be no problems.
13. On July 21, 1998, plaintiff was informed by Fran Pearson, a nurse working for defendant-employer that she would no longer be able to see Dr. Nichols. Thus, plaintiff did not go to her appointment that Dr. Nichols had scheduled for July 22, 1998.
14. On July 23, 1998, because she continued to experience severe pain and was not authorized to see Dr. Nichols, plaintiff went on her own to a hospital emergency room in Greenville for treatment.
15. On Friday, July 24, 1998, plaintiff drove to Raleigh and reported for work at her normal time. She was informed that she should return home, and come back on Monday to talk with Ms. Howard who was not at work that day. Plaintiff provided defendant-employer with a copy of a statement she had received from the emergency room the previous day, establishing that she had been to see a doctor and she continued to have significant limitations.
16. On Monday, July 27, 1998, plaintiff reported for work and was informed by Ms. Howard that she had been discharged for not coming to work during the previous week. Ms. Howard testified that she did not recommend plaintiff's discharge and did not know who really made that decision. She further indicated that she did not know what the company's attendance policies were.
17. On the afternoon of Monday, July 27, 1998, plaintiff kept an appointment with Dr. Scott Sanitate that had been arranged by defendants. Plaintiff's friend, Sharon Robinson, accompanied her to this appointment and went into the examination room with her. Plaintiff was still in significant pain and was dragging her right leg to a significant extent.
18. Dr. Sanitate did a minimal evaluation and indicated to plaintiff that he thought all of her problems would resolve with no surgical intervention and with minimal treatment. He did, however, recommend a steroidal injection, which was scheduled for August 4, 1998.
19. Plaintiff was unable to attend the scheduled appointment on August 4, 1998, for the injection because she had started working another job. She asked that the appointment be rescheduled, but defendants did not reschedule it. Following July 27, 1998, defendants never provided plaintiff any type of medical treatment.
20. Beginning on July 14, 1998, and continuing up until shortly before the date of the hearing in this case, plaintiff kept a "diary" documenting how she was feeling and the functional limitations and problems she experienced in her day to day activities over more than a year and a half. These records indicate that plaintiff experienced consistent and severe levels of pain in her back, neck, and leg; and, that the pain caused her great difficulties in attempting to work or do household chores. There were days when plaintiff could do very little.
21. From her date of injury and continuing through the date of hearing before the deputy commissioner, plaintiff continued to experience severe levels of pain in her neck, back, shoulder and leg. She was unable to sit for long periods, unable to stand for significant periods, and unable to walk any significant distances. These were activities that she used to regularly do before her injury. Plaintiff also experienced difficulty in doing routine chores such as cleaning her house.
22. The significant limitations and difficulties experienced by plaintiff were confirmed by Anisha Hicks, who testified that she actually lived with plaintiff for several months, beginning on July 20, 1998, in order to assist plaintiff in caring for her child and doing household chores. Ms. Hicks further testified that thereafter, plaintiff continued to exhibit symptoms of pain which significantly limited her activities and that plaintiff did not have these types of physical limitations prior to her injury. The testimony of Ms. Hicks is found to be credible.
23. Sharon Robinson and Edna Taylor corroborated the testimony of plaintiff and Ms. Hicks. They testified that they observed plaintiff's difficulty in walking and carrying on routine activities of daily living after her injury.
24. Following her termination from employment with defendant-employer, plaintiff had no health insurance, and had very limited funds which prevented her from obtaining medical treatment. In September, 1998, based on an advertisement in the newspaper promising a free evaluation, plaintiff obtained an evaluation from a chiropractor; however, she was not financially able to continue the treatment recommended by the chiropractor.
25. Beginning in late October, 1998, plaintiff began to see Dr. Huh, at the Duke Hospital Pain Clinic. Plaintiff was referred to Dr. Huh by her gynecologist who was also a doctor at Duke Hospital. Plaintiff continued to see Dr. Huh from October, 1998, through the date of hearing. However, because of her limited resources and lack of health insurance, she was unable to see Dr. Huh as frequently as he recommended. She was also financially unable to purchase all of the medications he prescribed or obtain the diagnostic tests such as cervical and lumbar MRI's that he prescribed.
26. Dr. Huh is a board certified anesthesiologist and board eligible pain management specialist. Dr. Huh was of the opinion and the Full Commission finds as fact that plaintiff was experiencing very real and significant levels of pain in her neck, back, and leg and that she was not exaggerating her level of pain during the period he treated plaintiff.
27. Based on a description of the slip and fall that plaintiff experienced on June 5, 1998, Dr. Huh was of the opinion and the Full Commission finds that the types of problems he diagnosed for plaintiff were likely to have arisen from such a twisting fall.
28. Dr. Huh was also of the opinion and the Full Commission finds as fact that plaintiff has developed significant depression secondary to her chronic pain. He further opined that this was not at all unusual and that a doctor needed to treat the depression as well as the pain in order for a patient to obtain significant pain relief.
29. Dr. Huh also opined that plaintiff's inability to attend regular and scheduled appointments, due to her financial situation, negatively affected her treatment and possibilities for recovery; but her prognosis for a significant recovery is fair, provided she is able to attend regularly scheduled medical visits at the pain clinic, receive all of the medication prescribed, attend regular psychotherapy sessions, and attend a regular, long-term physical therapy program. As a result of her injury, plaintiff is in need of future medical treatment as recommended by Dr. Huh.
30. Dr. Huh also expressed the opinion, based on his evaluation of plaintiff in October, 1998, and the history that she provided, that she was not and had not been capable of performing a job that required her to sit in a car and drive the vehicle for approximately 4 hours out of an 8 hour shift due to the pain and difficulties that she experienced. He indicated that sitting in a car would significantly aggravate the type of pain that plaintiff experienced.
31. Greater weight is accorded to the opinions of Dr. Huh over those from the written medical notes of Dr. Sanitate, Dr. Nichols, Dr. Lambertson and Dr. Adomonis. Dr. Huh is more qualified by training to assess chronic pain. Also, the other doctors were not deposed; only their treatment records are in evidence and they treated plaintiff for shorter periods of time.
32. Before she started working for defendant-employer, plaintiff was a part-time bus driver for a Head Start program operated by a non-profit organization known as Wayne Action Group for Economic Solvency (WAGES). Following her discharge from Laboratory Corporation, plaintiff contacted WAGES and was able to obtain employment driving a bus on a part-time basis. As of the date of the hearing, she continued to be employed in that capacity. Plaintiff normally drives a bus for WAGES on a split shift. During August and September, 1998, plaintiff's pain was so severe at times that she felt like screaming. There were days when she had pain with every movement She felt she had to work to support her child and herself. Driving the bus causes plaintiff considerable pain. On most days between her trips, she returns home and lies down, to enable her to make the trip later in the day. Despite experiencing very intense pain, she has continued to perform her duties as a part-time bus driver.
33. While defendants paid plaintiff some temporary disability benefits during the periods she was unable to work from June 9 — June 16, and June 19 — July 15, 1998, they have paid her no benefits for the period since July 20, 1998. As a result of her injury, plaintiff was unable to earn wages in any employment from July 20, 1998 through July 31, 1998.
34. As a result of injury, plaintiff has sustained diminished wage earning capacity. Plaintiff's earning as a part-time bus driver are indicative of her wage earning capacity. Plaintiff has been partially disabled since August 1, 1998.
35. Defendants have provided plaintiff with no medical treatment since her appointment with Dr. Sanitate on July 27, 1998.
36. There is insufficient evidence from which to establish that plaintiff is at maximum medical improvement.
37. Plaintiff's average weekly wage of $280.00 yields a weekly compensation rate of $186.67.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On June 5, 1998, plaintiff sustained a compensable injury by accident to her back, neck, shoulders and leg arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. §97-2(6).
2. As a result of her injury, plaintiff is entitled to additional temporary total disability benefits from July 21, 1998 through July 31, 1998 and temporary partial disability benefits in varying amounts depending on her wage differential for the period from August 1, 1998 and continuing for up to 300 weeks from the date of injury. N.C. Gen. Stat. § 97-30.
3. Defendants are liable for all medical treatment received up to this date by plaintiff for the problems that she experiences with her back, neck, shoulder, and leg, including the bills for her visits to hospital emergency rooms, and for all charges for the services and treatment provided by Dr. Huh. N.C. Gen. Stat. § 97-25.
4. Dr. Huh is approved as the primary treating physician for plaintiff. Defendant shall further pay for the costs of on-going reasonable and necessary medical treatment recommended by Dr. Huh for the problems arising from plaintiff's June 5, 1998 injury by accident, including psychological or psychiatric treatment to assist plaintiff in dealing with her chronic pain, as well as appropriate diagnostic tests. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff additional temporary total disability benefits from July 21, 1998 through July 31, 1998 at the rate of $186.69 per week and partial disability compensation from August 1, 1998 and continuing for up to 300 weeks from the date of injury at the rate of 2/3 of the difference between plaintiff's pre-injury weekly wage of $280.00 and her varying wages after July 31, 1998.
2. Defendants shall pay all medical expenses incurred or to be incurred in the future by plaintiff arising from her compensable injuries, including treatment provided by Dr. Huh and treatment recommended by Dr. Huh.
3. Defendants shall pay plaintiff's attorney one fourth of the indemnity compensation awarded to plaintiff herein payable as follows: one-fourth of all accrued compensation due plaintiff shall be deducted and paid directly to plaintiff's counsel; thereafter, plaintiff's counsel shall receive every fourth check.
4. Defendants shall pay the costs due this Commission.
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ THOMAS J. BOLCH COMMISSIONER
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER
BSB:md